Present: Carrico, C.J., Lacy, Hassell, Keenan, and Koontz, JJ., Poff and Whiting, S.JJ.

AEGIS WASTE SOLUTIONS, INC.

v.   Record No. 001350

CONCERNED TAXPAYERS OF
BRUNSWICK COUNTY, ET AL.

OPINION BY
CHIEF JUSTICE HARRY L. CARRICO
April 20, 2001

DEPARTMENT OF ENVIRONMENTAL
QUALITY, ET AL.

v.   Record No. 001363

CONCERNED TAXPAYERS OF
BRUNSWICK COUNTY, ET AL.

FROM THE COURT OF APPEALS OF VIRGINIA

These appeals stem from a case governed by the provisions of the Administrative Process Act, Code §§ 9-6.14:1 through -6.14:25 (the APA).  In the case, the Virginia Department of Environmental Quality (DEQ) awarded AEGIS Waste Solutions, Inc. (AEGIS) a permit to construct and operate a landfill facility in Brunswick County.  DEQ later awarded AEGIS two amendments to the permit.

Concerned Taxpayers of Brunswick County (Concerned Taxpayers), an unincorporated association, and eight of its individual members who own property adjacent to or nearby

the landfill (the Property Owners)[1] appealed DEQ's award of the permit and the amendments to the Circuit Court of Brunswick County pursuant to Code § 9-6.14:16, part of the APA.[2]

The circuit court affirmed the awards. Concerned Taxpayers and the Property Owners then appealed to the Court of Appeals of Virginia. The Court of Appeals reversed the judgment of the circuit court and declared the permit and the amendments void. Concerned Taxpayers of Brunswick County v. Department of Envtl. Quality, 31 Va. App. 788, 805, 525 S.E.2d 628, 636 (2000). We awarded AEGIS and DEQ separate appeals and consolidated them for consideration. When appropriate, we will refer to AEGIS and DEQ collectively as the Proponents and to Concerned Taxpayers and the Property owners as the Opponents.

Code § 10.1-1408.1(B)(1), part of the Virginia Waste Management Act, Code §§ 10.1-1400 through –1457, provides that "[n]o application for a new solid waste management

---

[1] The Property Owners are J. M. Moseley, Jr., M. K. Moseley, Jerry L. Marston, H. Bruce Brandon, Julia Reavis Blandford, James F. Hite, Charles M. Bland, and Sidney E. Brown. All are here as appellees.

[2] One of DEQ's assignments of error raises the question whether Concerned Taxpayers had representational standing to seek judicial review of DEQ's decisions. However, we will not address that question. The Property Owners' standing is not questioned; hence, an opinion on Concerned Taxpayers' standing would be merely advisory.

2

facility permit shall be complete unless it contains," inter alia, "[c]ertification from the governing body of the county, city or town in which the facility is to be located that the location and operation of the facility are consistent with all applicable ordinances."  AEGIS's application for a permit contained a certification by an authorized representative of the governing body of Brunswick County that "the proposed location and operation of the facility [were] consistent with all ordinances."

The Opponents contend, however, that DEQ was without authority to consider AEGIS's application for the landfill facility complete or to issue the permit because the application included three parcels of land not then owned by AEGIS and not certified by Brunswick County as required by Code § 10.1-1408.1(B)(1).[3]  The Opponents also contend that DEQ was without authority to consider and grant amendments to the permit because it included the three non-certified parcels.

The three parcels are identified in the record as Tax Map Parcels 53-143A, 63-33A, and 63-47.  The parties refer to the parcels as "the Outparcels."  We will employ the same terminology.

---

[3] It is undisputed that the certification issued by Brunswick County did not include the three parcels.

3

The record shows that on September 15, 1993, the Board of Supervisors of Brunswick County granted AEGIS a conditional use permit (CUP) for the landfill facility on a parcel of land estimated to contain 755 acres.[4]  On October 22, 1993, the County issued the certification that the location and operation of the facility were consistent with all ordinances.

As part of the permit process, AEGIS was required to file a notice of intent with DEQ providing, inter alia, the precise location of the proposed facility.  On October 27, 1993, AEGIS submitted a notice of intent to DEQ along with site and location maps and the certification of consistency issued by Brunswick County.

DEQ advised AEGIS to submit a "Part A" application, and AEGIS filed such an application on December 6, 1993. The purpose of the Part A application is to provide DEQ with information necessary to determine site suitability. As required, AEGIS furnished a key map and a near-vicinity map with the application.  DEQ notified AEGIS on December 21, 1993, that the application appeared to be complete and

_____

[4] The action of the Board of Supervisors in granting the conditional use permit was the subject of an appeal to this Court in Concerned Taxpayers of Brunswick County v. County of Brunswick, 249 Va. 320, 455 S.E.2d 712 (1995). The decision in that case is not pertinent here.

4

that a technical review would be made applying detailed "siting criteria."

During the review process, DEQ required AEGIS to file a modified near-vicinity map, and AEGIS filed the modification on March 15, 1994. The Outparcels are marked with an "A" inside a circle on the modified map and are shown as adjacent parcels outside the "proposed site boundary." A note on the map states that "[p]arcels designated by an A [inside a circle] are currently under negotiation for inclusion in the site." On March 25, 1994, DEQ approved the Part A application on condition that "[t]he facility boundary and the maximum extent of the disposal units shall be maintained as shown on the revised Near Vicinity Map, submitted to the Waste Division on March 15, 1994."

AEGIS then submitted a Part B application. The purpose of the Part B application is to provide DEQ with detailed engineering design and operating plans for the proposed facility. When the application is complete, DEQ conducts a technical review of the application, applying design and construction standards.

While the Part B application was being reviewed, AEGIS acquired title to the Outparcels and requested a conditional use permit from Brunswick County authorizing

5

use of the Outparcels in the landfill facility.  The County denied the request.

Apparently aware of the denial, in a letter dated October 21, 1994, DEQ reminded AEGIS of the condition attached to the Part A approval which provided that "[t]he facility boundary and the maximum extent of the disposal units shall be maintained as shown on the revised Near Vicinity Map [denoted as Figure 3 in the Part A application], submitted in the Waste Division on March 25, 1994."  DEQ indicated that two of the Outparcels, Nos. 63-33A and 63-47, were included as part of the facility boundary in the revised Part B application and would have to be removed to make the boundary consistent with Figure 3.

Later, AEGIS's engineering firm responded to a letter from DEQ dated January 3, 1995, with reference to another drawing, No. 3, styled "Proposed Site Features," that was filed with the Part B application.  According to the letter, DEQ had posed this problem:

> Parcel 53-43A . . . delineated in Figure 3 of the Part A [application] is denoted as an adjacent parcel to the permitted boundary.  However, Drawing No. 3 [of the Part B application] includes this parcel in the Part A permitted boundary.  Please clarify.

The engineering firm responded that "Drawing No. 3 has been revised to show Parcel 53-143A outside of the Part A

6

permitted boundary." A map marked "Drawing No. 3," apparently the revised version, is contained in the record. It shows all three Outparcels outside the "Part A Permit Boundary."

Upon completion of its review, DEQ prepared a draft permit and held a public hearing in Brunswick County. Following the hearing and the receipt of public comment, DEQ issued Permit No. 583 to AEGIS on April 17, 1995. The permit stated that "[t]he total site property consists of approximately 854 acres." However, the permit also stated that "[t]his landfill will consist of two separate sections for disposal of Industrial waste and Sanitary waste," with the "total allowable disposal acreage determined by the Part A Application approval," consisting of "approximately 82 acres for the Industrial Landfill Area (ILA) and approximately 137 acres for the Sanitary Landfill Area (SLA)."

The Opponents then filed a petition for appeal in the Circuit Court of Brunswick County. While the appeal was pending, AEGIS requested two amendments to the permit. The second request sought "a 141-acre expansion of the solid waste disposal footprint in the sanitary area," but neither amendment involved the Outparcels or effected a change in the permitted boundary of the landfill facility.

7

However, in comment periods following public hearings on the permit and the amendments, questions were raised about facility boundaries and complaint was made that the original permit included parcels that had not been certified by the governing body of Brunswick County. DEQ responded that "[t]he Part A area does not include [Outparcel] #s 63-33A, 63-47, or 53-143A" and that while AEGIS had acquired the Outparcels since "the time of the initial Part A application . . . the Conditional Use Permit still does not allow the properties to be included in the Part A [permitted] area." DEQ also stated that "[j]ust because a property is shown on a landfill drawing does not necessarily indicate that it is included in the facility plans for landfilling."

Another question raised during the comment periods inquired why the permit states "there are over 800 acres when there are only 755 acres approved in the Brunswick County Conditional Use Permit?" DEQ replied that the "total site property consists of approximately 974 acres." DEQ explained that the 755-acre figure used in the CUP and in the Part A approval was derived from tax maps and deed descriptions and did not include the Outparcels. DEQ stated that "a more recent survey of the properties within the boundaries that were estimated to be 755 acres"

revealed that "the actual acreage is 822 acres." DEQ said it was important to note that "waste disposal activities can only take place within the areas designated potential disposal areas," consisting of only 428.5 acres.

In another comment, it was asserted that "a note (3)" on permit maps "says [the unzoned Outparcels] are included in the Part A permit limits," and the question was asked, "[w]hat is to prevent these or any other land in the area from being used for waste five or ten years from now?" DEQ responded that "[t]he note 3 has been revised to indicate that the [Out]parcels are 'not' included in the Part A approval limits."[5] DEQ also stated that before the Outparcels could be included within the limits of the Part A approval they must be declared by Brunswick County to be consistent with all applicable ordinances and undergo the process of requesting a major permit amendment, complete with a public hearing by DEQ.

A final comment posed the question why "[t]he landfill office" and "certain groundwater monitoring wells" were located on the unzoned Outparcels. DEQ explained that it "does not regulate buildings used as offices." An "office is not considered a waste management facility [because] no

---

[5] As indicated previously, a map showing this revision is contained in the record.

waste management activities occur [where the office is located]."  As for the monitoring wells, DEQ said "there is no prohibition against these features being located outside the limits of Part A approval, as long as they are located on land owned by AEGIS and have a permanent easement recorded," which "has been obtained."[6]

While action on the two amendments was still pending, AEGIS submitted a request that an authorized representative of Brunswick County sign a certification that the "proposed location and operation of the [sanitary landfill] facility [are] consistent with all ordinances."  The County Administrator signed the certification on October 9, 1997. In a letter of the same date addressed to DEQ, the County Administrator stated that "the proposed expanded landfill operation and footprint lies within the limits of and is consistent with the existing Conditional Use Permit as approved by the Brunswick County Board of Supervisors."

---

[6] DEQ's position on this point is correct.  Code § 10.1-1408.1(B)(1) requires certification of consistency by a local governing body for a new solid waste management facility.  Code § 10.1-1400 defines a solid waste management facility as "a site used for planned treating, long term storage, or disposing of solid waste."  The use of land for offices and monitoring wells does not constitute the treatment, storage, or disposal of solid waste and the land does not become part of a solid waste management facility.  Hence, the requirements of Code § 10.1-1408.1(B)(1) do not apply.

DEQ granted both amendments, one on December 10, 1997, and the other on May 4, 1998. By separate petitions, the Opponents appealed the amendments to the Circuit Court of Brunswick County, contending that the amendments were invalid because the original permit included the Outparcels and was itself invalid. The circuit court consolidated these appeals with the Opponents' original appeal and subsequently dismissed all three appeals with prejudice.

In its opinion, the Court of Appeals concluded that DEQ "improperly issued the permit and permit amendments that authorized the landfill facility operated by AEGIS because three parcels which were included in the permit and permit amendments were not certified by the local government pursuant to Code § 10.1-1408.1(B)(1)." Concerned Taxpayers, 31 Va. App. at 805, 525 S.E.2d at 636.

In reaching this conclusion, the Court focused upon the statement contained in the initial permit that "the 'total site property consists of 854 acres,' which includes the three after-acquired parcels." Id. at 804, 525 S.E.2d at 636. The Court also stressed that "[t]he three parcels were included within the property boundaries on the map submitted with Part B of the application" and that "DEQ issued the permit to include the property boundaries

11

represented on the maps submitted with the Part B application."  Id. at 804, 525 S.E.2d at 635-36.

The Opponents embrace the Court's rationale and support its holding that the three Outparcels were improperly included in the permit.  The Opponents also focus upon a statement concerning "total site property" found in the second amendment to the permit, which reads: "The total site property consists of approximately 974 acres.  Of that acreage, 822 acres are approved by the County and the DEQ for potential waste management activities."  The Opponents then argue that "on its face, the DEQ permit is issued by its own terms for a facility site consisting of 974 acres, . . . including all Outparcels."

The Proponents disagree with the rationale of the Court of Appeals and insist that the Outparcels were not included in the permit.  Hence, the crucial question becomes whether DEQ included the three Outparcels in the permit it issued to AEGIS.

Code § 9-6.14:16, part of the APA, permits judicial review of agency action.  Code § 9-6.14:17 provides that "[t]he burden shall be upon the party complaining of agency action to designate and demonstrate an error of law" on issues including "compliance with statutory authority" and

12

"the substantiality of the evidential support for findings of fact."

The Opponents argue that "[t]he question of whether an agency acted within the scope of its authority, as in the case at bar, is a question of law" involving statutory interpretation and, therefore, DEQ's action in determining that the Outparcels were not included in the permit "is entitled to little deference." However, whether a given parcel of land is included in a permit but not included in the certification of a local governing body is an issue of fact. And, since Code § 10.1-1408.1(B)(1) is so clear and unambiguous in its provision that "[n]o application for a new solid waste management facility permit shall be complete unless it contains" the certification of consistency with local ordinances, no statutory interpretation is required. In such a situation, "[w]hen the decision on review is . . . to be made on [the] agency record, the duty of the court with respect to issues of fact is limited to ascertaining whether there was substantial evidence in the agency record upon which the agency as the trier of the facts could reasonably find them to be as it did." Code § 9-6.14:17; see also Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983). In Bias, we said:

13

The "substantial evidence" standard, adopted by the General Assembly, is designed to give great stability and finality to the fact-findings of an administrative agency. The phrase "substantial evidence" refers to such relevant evidence as a reasonable mind <u>might</u> accept as adequate to support a conclusion. Under this standard, . . . the court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind would <u>necessarily</u> come to a different conclusion.

226 Va. at 269, 308 S.E.2d at 125 (citations omitted).

In their arguments, the Opponents attempt to equate the phrase "total site property" with the phrase "facility site." The former phrase was used in the second amendment to the permit in this context: "The total site property consists of approximately 974 acres. Of that acreage, 822 acres are approved by the County and the DEQ for potential waste management activities, with approximately 428.5 acres approved for potential waste disposal." In this context, it is clear that the reference to "total site property . . . of approximately 974 acres" was intended to define AEGIS's total holdings, both approved and unapproved, while the reference to the 822 acres was intended to define the "facility site," to borrow the Opponents' terminology, meaning the site already approved for potential waste management activities. Hence, we think the phrase "total site property" means, in context, something entirely

14

different from the phrase "facility site," and we reject the Opponents' attempt to make them synonymous.

On a related point, the Opponents take the position that any parcel of land shown on a map submitted in connection with an application for a landfill permit is automatically included in the permit if the application is granted. The Opponents say: "A fortiori, if the uncertified properties are included in the Part B application, they are necessarily part of the Permit." This is an unrealistic approach. The common-sense approach would be that, if, in a given case, the intention is made clear to exclude from a permit a particular parcel shown on a map filed with an application, the permit is valid for the remaining portion.

That intention is made clear in this case. On the near vicinity map AEGIS submitted with its notice of intent, the proposed site boundary not only served to provide the precise location of the proposed facility but also clearly excluded the Outparcels, which were depicted as adjacent parcels. The Outparcels were treated in the same manner on the revised vicinity map AEGIS submitted on March 15, 1994, leading to DEQ's approval of the Part A application on the condition that "[t]he facility boundary

15

and the maximum extent of the disposal units shall be maintained as shown on the revised Near Vicinity Map."

In connection with its Part B application, AEGIS filed a map which the Opponents say "now <u>includes</u> all three of the previous parcels shown as under negotiation in the Near Vicinity Map as <u>part of the property boundary</u> of AEGIS." This is correct; the map does include the Outparcels within the property boundary shown on the map but it <u>does not</u> include the Outparcels within the "Part A permit boundary," also shown on the map. The Opponents' position on this point displays a reluctance to distinguish "property boundary" from "permit boundary," "site boundary," or "facility boundary," as those terms are used on maps contained in the record. It is plain that the marking of the property boundary is intended to show all the property AEGIS owns in the area while the delineation of the other boundaries is intended to serve the entirely different purpose of defining the facility site.

If the intention to exclude the Outparcels from the permit is not made clear by what has been said so far, the intention is made crystal clear by a map the Opponents say "will help us understand [the] issues" in the case. The map was filed in connection with one of AEGIS's applications for amendments to the permit and purports to

16

represent all the changes that were made in the plans.  The map shows that the areas encompassed within the "DEQ permitted boundary" and the "conditional use permit limits" are identical and that the Outparcels are not encompassed within either of those areas.  Furthermore, Note 3 on the map states:  "[The Outparcels] have since been purchased by AEGIS Waste Solutions, Inc.  They are not, however, included in the Part A approval limits."

Finally, we think it is of significance that Brunswick County issued a second certification of consistency after substantial controversy arose in the local public arena over the three Outparcels, with the Opponents contending the Outparcels were included in the Part B application and DEQ contending they were not.  It will not be assumed that the County made the new certification without knowledge of the then current status of the DEQ proceedings.

Under these circumstances, we have no difficulty in finding there was substantial evidence in the agency record upon which DEQ as the trier of the facts could reasonably find that the Outparcels were not included in the permit issued to AEGIS.  Indeed, we think the evidence of exclusion is overwhelming.

Accordingly, we will reverse the judgment of the Court of Appeals, reinstate the judgment of the Circuit Court of

Brunswick County, and enter final judgment in favor of

AEGIS and DEQ.

Reversed and final judgment.